IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Jaime B. Norris, | CASE NO. 1:23-cv-1540 |
| Plaintiff, | DISTRICT JUDGE<br>David A. Ruiz |
| vs. | |
| Commissioner of Social Security, | MAGISTRATE JUDGE<br>James E. Grimes Jr. |
| Defendant. | |
| | **REPORT AND RECOMMENDATION** |

Plaintiff Jamie B. Norris filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural background**

In October 2020, Norris filed an application for disability insurance benefits and supplemental security income alleging a disability onset date of

January 1, 2020.[1] *E.g.*, Tr. 87. In pertinent part, Norris claimed that he[2] was disabled and limited in his ability to work due to anxiety, depression, HHT[3], COPD[4], post-traumatic stress disorder, panic disorder, irritable bowel syndrome, migraines, and agoraphobia.[5] *Id.* The Commissioner denied Norris's application initially and upon reconsideration. Tr. 138, 151.

In February 2021, Norris requested a hearing. Tr. 153. Administrative Law Judge ("ALJ") Pamela Loesel held a telephonic hearing in July 2022. Tr. 47. Norris appeared, testified, and was represented by counsel at the July 2022

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2]     The medical records indicate that Norris is a transgender male, who may use or have previously used the name Gethin Xtasis. *See e.g.*, Tr. 366; Doc. 11, at 1. He/him/his pronouns are used throughout the record, as medical records indicate those are his preferred pronouns. *See* Tr. 366.

[3]     HHT is the abbreviation for the inherited disorder hereditary hemorrhagic telangiectasia, which causes spontaneous and unprovoked bleeding due to arteriovenous malformations. *Hereditary hemorrhagic telangiectasia*, Mayo Clinic Disease & Conditions, https://www.mayoclinic.org/diseases-conditions/hht/symptoms-causes/syc-20351135 [https://perma.cc/9AGQ-PUU7].

[4]     COPD is the abbreviation for chronic obstructive pulmonary disease, a chronic inflammatory lung disease that causes obstructed airflow from the lungs. *COPD*, Mayo Clinic Diseases & Conditions, https://www.mayoclinic.org/diseases-conditions/copd/symptoms-causes/syc-20353679 [https://perma.cc/N6TL-8MBQ].

[5]     Agoraphobia is the intense, irrational fear of open spaces characterized by a fear of venturing out alone or of being in a public place where escape might be difficult and help unavailable. Dorland's Illustrated Medical Dictionary 40 (33rd ed. 2020).

hearing. *Id.* Qualified vocational expert Gwendolyn Ligon also testified. *Id.* In September 2022, the ALJ issued a written decision, which found that Norris was not entitled to benefits. Tr. 25–41.

In October 2022, Norris appealed the ALJ's decision to the Appeals Council. Tr. 216–217. In July 2023, the Appeals Counsel denied Norris's appeal, making the ALJ's September 2022 decision the final decision of the Commissioner. Tr. 25–41; *see* 20 C.F.R. §404.981.

Norris timely filed this action in August 2023. Doc. 1. In it, he asserts the two following assignments of error:

> 1.      Did the ALJ err at Step Four (4) by finding Dr. Hunt's opinion unpersuasive?
>
> 2.      Did the ALJ err at Step Five (5) by finding significant numbers of occupations exist under the final RFC?

Doc. 9, at 1.

**Evidence**

*1.    Personal and vocational evidence*

Norris was born in 1981, making him 38 years of age at the time of disability onset. Tr. 87. He completed high school and several times attended, but did not complete, college. *E.g.*, Tr. 56. He has relevant past work experience as a food mixer, DOT[6] 520.685-162, animal caretaker, DOT 410.674-101,

---

[6]      DOT stands for the Dictionary of Occupational Titles. It is a standard classification of occupations established by the Social Security Administration. The DOT includes descriptions of the physical demands, environmental factors, and skill levels for various occupations.

nursery school attendant, DOT 359.677-018, and office assistant, DOT 239.567-010. Tr. 40.

### 2. Medical evidence[7]

In October 2020, Antone Feo, Ph. D, noted that he treated Norris for depression, anxiety, and PTSD. Tr. 354. Dr. Feo did not check the applicable box to indicate that Norris's "mood/affect" was notable, but he wrote, without explanation, that Norris's affect was notable. Tr. 356. Additionally, Dr. Feo noted that Norris was "oriented to person, place and time" and that his other behaviors and functions were "unremarkable." Tr. 356. Also in October 2020, Robert R. Pollard, M.D., described Norris as very anxious during a consultation regarding a possible hysterectomy. Tr. 365. He also noted past medical history of anxiety, depression, hallucinations, gender dysphoria, PTSD, and maladaptive coping skills. Tr. 364–365.

In November 2020, Norris established treatment with Barbara Hunt, Ph.D, LPCC, LSW. Tr. 668. Dr. Hunt noted that Norris was referred to her treatment by his significant other, Raine. Tr. 668. Dr. Hunt also noted that Norris self-reported having bipolar disorder, schizophrenia, and PTSD. Tr. 668. Norris also reported that he was adopted and raised in Louisiana and that his mother was very emotionally abusive, and his father was absent. Tr. 668. Throughout November 2020 through January 2021, Norris saw Dr. Hunt

---

[7] The recitation of medical evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs.

multiple times each month. Tr. 668–675. Dr. Hunt noted history of "a lot of trauma," including multiple rapes when Norris was a child. Tr. 671–672.

Also in November 2020, Dr. Hunt performed a Gender Profile Assessment, which included administering the Minnesota Multiphasic Personality Inventory-2 (MMPI-2). Tr. 598–602. Dr. Hunt memorialized the Assessment in January 2021. Tr. 598. The MMPI-2 results were found to be valid and endorsed signs of a person with long-term psychological problems, feelings of hostility and aggression, feeling socially inadequate, and lacking trust in other people. Tr. 601. Dr. Hunt concluded that Norris "has had no regrets in transitioning. He has wanted top surgery for many years, but Gethin is very dependent upon others emotionally and financially. He has a very low self-esteem and seems to attract others that are very manipulative" Tr. 601. She noted that Norris reported social anxiety and wrote that "he felt he was very intimidated by bosses that would criticize him. When they would, he felt that he was a failure and would get more anxious" Tr. 602. Dr. Hunt further concluded that Norris had very low self-esteem and that prescribed medications were not helping with his anxiety, thus Norris was referred for a psychiatric evaluation. Tr. 602.

In December 2020, Norris was treated by Anastasia Driscoll, APRN-CNP, related to his weight management. Tr. 493. Eight days later, Norris reported to Laura Mintz, MD, that he was "actively working on weight loss"

and that his "mental health is wildly improved/has been working really hard." Tr. 490.

In February 2021, state consultative examiner, James C. Tanley, Ph.D., performed a state psychological evaluation of Norris related to his claims for disability benefits. Tr. 472. Dr. Tanley noted Norris's Chief Complaint was "I have nosebleeds, asthma, COPD, sinus infection, constipation, migraines, and a food addiction." Tr. 472. Norris told Dr. Tanley that he stopped working at a Subway restaurant, where he had been employed for two years, "before Halloween" because he was coughing up blood. Tr. 473. Norris also described that he left a position at a Chipotle restaurant when he moved out of state, he worked seasonally at a pet supply store, and he left a position as a camp counselor because his roommate's parents urged him to get a "better job." Tr. 473. Norris committed two errors when counting forwards in increments of three and recalled two of three items after five minutes of distraction, recalling the third item after cueing. Tr. 474. Dr. Tanley diagnosed Norris with unspecified mood disorder, moderate severity; social anxiety disorder; and gender dysphoria. Tr. 475. He opined that, if Norris's symptoms were to worsen, they "could negatively impact" his ability to maintain attention and concentration "by interfering with his ability to focus and to concentrate." Tr. 476. Dr. Tanley opined that Norris's symptoms "could make the free and easy commerce of social interaction on the job problematic" and "could be expected

6

to lower his frustration tolerance and put him at some degree of risk for the pressures of work." Tr. 476.

In November 2021, Norris attended an initial mental health assessment with pharmacologic management appointment. Tr. 536. He presented with euthymic mood[8], some paranoid thinking, auditory hallucinations, and difficulty with attention and concentration. Tr. 540. He also presented as cooperative, well groomed, logical, organized, with good judgment and insight, and with normal memory. Tr. 540. He was started on Vraylar, Vistaril, and propranolol to address his mood and anxiety. Tr. 541.

In December 2021, Norris attended another pharmacological management appointment. Tr. 555. He presented with some paranoia, auditory hallucinations, difficulty in attention and concentration, and euthymic mood. Tr. 560. He also presented as adequately groomed, cooperative, and oriented, with normal memory, full affect range, good judgment and insight, and logical and organized thought processes. Tr. 560. Norris was noted as doing "okay" and, despite having a few panic attacks over the past month, he stated that his medication "tends to help with keeping him calm" when he goes out. Tr. 556.

In March 2022, Norris attended a follow up appointment related to his medication. Tr. 630. It was noted that propranolol was "working nicely for

---

[8]    A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

anxiety/chest discomfort" and that he was "continuing to work on mental/physical health, eating and movement." Tr. 633.

In June 2022, Norris attended another pharmacological management appointment where he again had some paranoia, auditory hallucinations, euthymic mood, and difficulty with attention and concentration. Tr. 622. He was also noted, however, as being cooperative and fully oriented, having logical and organized thoughts, no suicidal/homicidal ideations, a full range of affect, normal memory, and good judgement and insight. Tr. 622

### 3. *Opinion Evidence*

In July 2023, Dr. Hunt provided a checkbox opinion outlining her assessment of Norris's residual functional capacity (RFC).[9] Dr. Hunt indicated that her opinions were based upon Norris's subjective complaints and her "expertise/training," not clinical evidence. Tr. 662. Dr. Hunt's supportive narrative consisted of the following statement: "Patient struggles w/ extreme anxiety w/ agoraphobia. He isn't able to leave his residence w/o someone with him. Very dependent & unable to make own decisions" Tr. 662. Dr. Hunt did not indicate what sort of work environment changes Norris could handle, what sort of tasks Norris was able to do, or what sort of production quotas would or would not be appropriate. Tr. 662. Dr. Hunt indicated that Norris could handle

---

[9]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

low stress work, could not do work involving confrontation, arbitration, or negotiation, could not handle strict time limits for completion of tasks, could not be responsible for the health, safety, or welfare of others, could not supervise, manage, or influence others, and could not travel, drive, or deliver for work. Tr. 662. And, Dr. Hunt indicated, Norris could never or only rarely interact with the public, co-workers, and supervisors. Tr. 662. She further checked a box indicating that Norris would be absent from work more than three times a month due to Norris's impairments or treatment. Tr. 667. She also indicated that Norris would be off-task approximately 15% of the time due to "unreasonable breaks/rest periods, interference with concentration, persistence or pace, or other related reasons." Tr. 667.

4.    *State Agency consultants*

In March 2021, state agency psychological consultant Kristen Haskins, Psy.D., made the following findings as to Norris's mental RFC:[10]

- "He would be expected to show little to no difficulty with memory and understanding[;]"

- "He would be expected to show little to no difficulty with tasks of increasing complexity and multi-step tasks[;]"

- "His current mood problems, anhedonia, anxiety, and gender dysphoria could make the free and easy commerce of social interaction on the job

---

[10]    Norris does not challenge any of the state agency consultant's RFC findings. Because Norris also does not dispute any of the assessments of his physical symptoms, the state agency's physical RFC assessment is not discussed.

problematic. Can superficially interact in the work setting[;]"

- "His current mood problems, Anhedonia, social anxiety, and gender dysphoria could be expected to lower his frustration tolerance and put him at some degree of risk for the pressures of work. The claimant can work in a setting where there are well-defined work goals and can carry out a simple routine despite minor changes in the work setting. Claimant will need major changes explained beforehand and gradually implemented to allow claimant time to adjust to the new expectations."

Tr. 93–94.

In December 2021, James Mehr, Ph.D., affirmed[11] the prior findings as to Norris's mental RFC at the reconsideration level. Tr. 113–14.

5.    *Hearing testimony*

Norris, who was represented by counsel, testified telephonically at an administrative hearing in July 2022. Tr. 47. Norris testified that he lived with two roommates, Raine Von Strauss and Thomas Duwart, Jr. Tr 54. Norris testified that both of his roommates worked full time jobs. Tr. 54. Norris explained that he was responsible for chores at the house, including "cleaning

---

[11]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

the bathroom, doing the dishes, things like that," but he did not handle meal preparation. Tr. 55.

Norris testified that he dressed himself and could make himself something to eat, but "usually d[id] not." Tr. 55. Norris explained that he had driven in the past, but currently did not drive or own a vehicle. Tr. 55. He stated that he stopped driving about a year before because he could no longer afford car insurance. Tr. 55–56.

Norris confirmed that he did not shop for personal items, groceries, or his medications. Tr. 56. He had no contact with family but did have one friend other than his roommates that visited every three or four months. Tr. 56.

Norris testified that he completed some college but did not obtain a degree. Tr. 56. He tried to go back to college twice after that. Tr. 56. He stated that the farthest he progressed in college was about a year from completion of his degree. Tr. 56. Norris testified that he first worked toward a degree in computer animation and design, then in psychology, and finally in computer science. Tr. 57. Norris later clarified that he did not complete his college degree the first time because he and his parents had a "falling out, and they decided [his parents] did not want to pay for it." Tr. 64. He stated that the "last two times, it was a matter of debt." Tr. 64. He explained that he did not really have issues with classwork and that the last time he attempted to attend college was before he began applying for disability. Tr. 64–65.

He previously painted and drew, but did not do that "much anymore." Tr. 57. He spent very little time on a computer or phone. Tr. 57. Norris explained that if he used a computer or cell phone, it was to contact doctors or send emails. Tr. 57

Norris explained that he did not have any hobbies at the moment and did not get any routine exercise. Tr. 57. He stated he had a pet rabbit. Tr. 57. Norris stated he did not do any kind of traveling and was not working at the time of his testimony. Tr. 57.

Next, Norris testified about his employment history. Tr. 58–63. Norris stated that his last place of employment was at Subway, where he worked part-time for about three months. Tr. 58. He stated that he worked about four days per week and worked under either 40 or 20 hours per week. Tr. 59.

Norris testified that he worked during 2018 and 2019 as a part-time camp counselor at a dog daycare facility called Top Dog . Tr. 59. Norris stated that his job at Top Dog involved feeding dogs, sometimes groomed them, and making sure that the dogs did not get into fights in the yards. Tr. 59. He also stated that he lifted the dogs from time to time, and that the heaviest ones were over 50 pounds. Tr. 59–60. He testified that he stood or walked most of the time during this employment. Tr. 60.

Norris testified that he worked in 2016 and 2017 as a prep chef for his cousin at a company called Bekry LLC. Tr. 60. He explained that his job responsibilities at Bekry included cleaning dishes, cleaning stations, preparing

12

certain things for the chefs, and cleaning utensils for the chefs. Tr. 60. Norris testified that he was on his feet most of the time and that he lifted or carried anywhere from 50 to 60 pounds, depending on the day. Tr. 61.

Norris testified that he worked as a "floater" for a daycare program at University United Methodist church in 2015 and 2016. Tr. 61. He explained that he prepared meals for snack time, changed diapers, watched over children, read stories, and generally cared for the children as one would at a daycare. Tr. 61. Norris worked with children ranging in age from infants to high school students. Tr. 61. He stated that he would occasionally have to lift the children, but the heaviest children he lifted or carried regularly were toddlers. Tr. 61–62. Norris stated that he did have to restrain a special needs teenager too if the teenager became violent. Tr. 62. Norris explained that he was also on his feet most of the time during the day. Tr. 62.

Finally, Norris testified that he worked in 2008 and 2009 with Conduit State Health Care. Tr. 62. He stated that his role at Conduit included working with Medicaid and Medicare claims and then in the mailroom. Tr. 62. Norris's job duties included mostly fixing pieces of information that the computer could not understand. Tr. 62. He explained that he "was supposed to be the mail carrier, but that didn't pan out." Tr. 62. He confirmed that he was seated at a desk working on a computer most of the time and that he worked at Conduit for about a year. Tr. 62–63. He stated that he did not lift  anything "incredibly heavy." Tr. 63.

13

Norris also testified regarding his various physical conditions and how they affected his daily or weekly living.[12] Tr. 65–69.

Norris next testified that his mental health diagnoses included, among other conditions, schizophrenia, and PTSD. Tr. 70. Norris then testified that his depression was active and described it as "the feeling of complete utter hopelessness, and it's a daily thing." Tr. 70. He explained that he has suicidal thoughts and has discussed them in counseling. Tr. 70. He also stated that due to his suicidal thoughts, he went into inpatient care "very briefly" in 2014. Tr. 70–71. Norris stated that these thoughts are staying the same. Tr. 71. He stated he will have crying spells "pretty often," which he explained amounted to a couple times a month. Tr. 71.

Norris testified that his anxiety caused him to "always be afraid." Tr. 72. He stated that his counselors have told him that his anxiety is related to his PTSD. Tr. 72. He described both auditory and visual hallucinations, which have recently occurred every day. Tr. 72. Norris explained that he had panic attacks, "pretty much daily, and they last, again, anywhere from a couple minutes to hours." Tr. 73. Norris lastly clarified that he would do cleaning "on good days" and that he does not do laundry, yardwork, or grocery shopping. Tr. 74–75.

---

[12]   Norris's challenge does not involve his physical condition. There is therefore no need to include a discussion of his testimony related to his physical symptoms.

14

6.    *Vocational Expert*

Vocational Expert, Gwendolyn Ligon, provided testimony during the July 2022 telephone hearing. Tr. 75–84. The ALJ posed several hypotheticals to Ms. Ligon. *E.g.*, Tr. 78. First, she described:

> A person with the same age, education, and past work as the claimant, who is able to occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds. Is able to stand and walk for six hours of an eight-hour workday, would have unlimited push and pull other than shown for lift and/or carry, could frequently climb ramps and stairs but never climb ladders, ropes, or scaffolds. This individual must avoid concentrating exposure to extreme cold and avoid even moderate exposure to fumes, odors, dust, gases, and poor ventilation. In addition, this hypothetical individual can perform simple, routine tasks consistent with unskilled work and can perform work with infrequent change, where changes are explained in advance and gradually implemented, and can perform work with superficial interaction with others, and by superficial, I mean of a short duration for a specific purpose.

Tr. 78. Ms. Ligon testified that this hypothetical person would not be able to perform Norris's past work either per the DOT or as performed. Tr. 78–79. Ms. Ligon further testified that there would, however, be multiple hypothetical jobs in the national economy that the hypothetical individual could perform. Tr. 79. Each of the jobs that Ms. Ligon described that the hypothetical individual could perform were sedentary jobs. Tr. 79.

The ALJ next expanded the hypothetical to assume that the hypothetical individual had the additional limitation of being "absent from work two or more days per month due to a combination of both physical and

mental health systems." Tr. 79. Ms. Ligon testified that there would be no jobs for this modified hypothetical individual because such absences would not be tolerated. Tr. 79–80.

The ALJ further modified the hypothetical such that the individual did not have two or more absences, but rather, "would be off-task approximately 20% of the workday, again, due to mental health symptoms." Tr. 80. Ms. Ligon testified that anything more than 10% of time off task, in addition to normal breaks, would be work-preclusive. Tr. 80. She added, however, that the DOT does not address time off-task or absences, so she was using her "education, training, and work experience as a vocational counselor" to make her conclusion. Tr. 80.

Ms. Ligon testified that she "would say that it would be a problem" if an individual "is bleeding and has an open wound that they're trying to deal with and still trying to work … on a routine basis." Tr. 82. She explained that the DOT, however, does not address this issue. Tr. 82. Ms. Ligon confirmed that, in her opinion, a limitation to "simple, repetitive, routine" tasks would "preclude the ability to carry out detailed written and oral instructions[.]" Tr. 83. Finally, Ms. Ligon stated that, in her opinion, it would be tolerated in the workforce if an employee has issues responding appropriately to criticism. Tr. 83. Ms. Ligon explained, however, that the DOT does not directly address this issue, so she was relying on her "education, training, and experience as a vocational counselor[.]" Tr. 83.

**ALJ Decision**

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2025.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2020, the alleged onset date (20 C.F.R. 404.1571 *et seq*., and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: chronic obstructive pulmonary disease/asthma, migraine headache disorder with aura, obesity, unspecified depressive disorder moderate severity, social anxiety disorder, gender dysphoria, post-traumatic stress disorder (20 C.F.R. 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments of 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the following range of medium work defined by 20 CFR 404.1576(c) and 416.967(c). The claimant can perform unlimited push and pull other than shown for lift and/or carry; frequently climb ramps and stairs; and never climb ladders, ropes or scaffolds. The claimant must avoid concentrated exposure to extreme cold; avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation. The claimant can perform simple routine tasks (consistent with unskilled work); can perform work with infrequent change where changes are explained in advance and gradually implemented; and can engage in superficial

17

interaction (meaning of a short duration for a specific purpose) with others.

6.    The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.    The claimant was born [in July 1981] and was 38 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 C.F.R. 404.1563 and 416.963).

8.    The claimant has at least a high school education (20 C.F.R. 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Par 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number sin the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569a, 416.969, 416.969a).

11.    The claimant has not been under a disability, as defined by the Social Security Act, from January 1, 2020, through the date of this decision. (20 C.F.R. 404.1520(g) and 416.920(g)).

Tr. 31–41.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The

claimant, however, retains the burden of proving h[is] lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the

conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Analysis**

Norris presents two issues on appeal to this Court. Doc. 9, at 1. Both arguments are refuted by the Commissioner, Doc. 11, at 12–18, and neither provide a sufficient basis for remand.

*1.    Norris's first issue* is that the ALJ improperly found at Step 4 that Dr. Hunt's opinion was unpersuasive. Norris makes four sub-arguments in support of his first issue. But before turning to these arguments, it bears noting that the opinion on which Norris bases his argument, *see* Doc. 9, at 3–4 (citing Tr. 662–67),  is a check-the-box form of the type that are often discounted in Social Security cases, *see*, *e.g.*, *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 630 (6th Cir. 2016). And this is the case because ALJs are "not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *See Cohen v. Sec'y of Dep't Health & Hum. Servs.*, 964 F.2d 524, 528 (6th Cir. 1992). So Norris's argument is not off to a strong start.

*First*, Norris argues that the ALJ's decision is "not factually supported or relevant." Doc. 9, at 6. In so arguing, Norris claims that the ALJ's decision

fails to provide facts, and that the record contains no facts, that would support the statement that Norris had a "good response to medication." Doc. 9, at 6. Norris also claims that the ALJ's consideration of his move to a different state was "irrelevant" to his capacity to perform full-time work and that the ALJ failed to explain how Norris's move "impacts or contradicts Dr. Hunt's opinion." Doc. 9, at 7.

To the extent that Norris argues there was no evidence in the record to support the ALJ's finding that Norris's symptoms improved with treatment, that argument is belied by the record. *See* Tr. 490 (stating that Norris's "mental health is wildly improved/has been working really hard"); Tr. 630 (noting that propranolol was "working nicely for anxiety/chest discomfort") (cited in ALJ decision at Tr. 38).

Norris claims that the evidence weighed and described by the ALJ as to his "residency in" other states was "not relevant." Doc. 9 at 6–7. For starters, Norris doesn't mention this aspect of the ALJ's decision in the *Facts* section of his brief. Doc. 9, at 1–4; *see* Doc. 5, at 4 ("Any facts recited in support of the *Argument* or *Analysis* section of a brief must also be set forth in the *Facts* section of the brief."). As noted in the Court's initial order, "[a]ny factual allegation or argument that relies on the record but that is not supported by a specific citation to the record will not be considered by the Court." Doc. 5, at 4. Norris does not cite the record in support of his assertion that the ALJ "implied" that Norris's past moves "weighed against" Dr. Hunt's opinion. So,

22

the Court need not consider this aspect of his argument. Moreover, even if the Court were to consider it, the argument takes the ALJ's statement out of context. The moves were but one of several reasons the ALJ provided for discounting Dr. Hunt's opinions. Tr. 38–39. Further, the moves specifically cut against the Dr. Hunt's finding that Norris could not travel. Tr. 662.

In any event, it is the duty of the ALJ to weigh the evidence. 20 C.F.R. § 404.1520c(a) (explaining how *the ALJ* will consider and weigh medical opinions and prior administrative medical findings); *see also Gill v. Comm'r of Soc. Sec.*, No. 1:22-cv-00981, 2023 WL 4078193, * 16 (N.D. Ohio April 24, 2023) ("[T]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony–that's the ALJ's job.") (quoting *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020)). That Norris disagrees with the weight the ALJ afforded to certain evidence does not mean that her decision was not supported by substantial evidence. *Biestek*, 139 S. Ct. at 1154 (2019) (explaining that substantial evidence is not a high burden). The fact that Norris points to other evidence of record that might support a different outcome does not show that the ALJ's decision was unsupported. *Jones*, 336 F.3d at 477 (recognizing that a court cannot overturn the Commissioner's decision, even if substantial evidence or a preponderance of evidence supports the claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ."). Norris does not provide any sufficiently developed argument that the ALJ's decision was not supported by substantial

evidence. Doc. 9 at 7. Rather, Norris asserts that the ALJ did not consider relevant facts. This argument is not accurate in light of the ALJ's lengthy discussion of the record of medical evidence and explanation of how she weighed the medical opinions of record. *E.g.*, Tr. 34–39.

In sum, Norris's first sub-argument amounts to a claim that the ALJ's decision was not supported by substantial evidence. Because the ALJ's decision is supported by substantial evidence, I recommend that this argument be rejected.

*Second*, Norris argues that his cooperation and issues with social interaction are consistent with Dr. Hunt's opinion.[13]

Norris states that "[t]he decision did not give a full review of the file, nor did it provide an appropriate articulation of the actual facts." Doc. 9, at 7. This claim is unsupported. The ALJ stated that she considered the entire record. Tr. 34. Absent evidence to the contrary, the Court will presume that this statement is true. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and,

---

[13]    Norris does not argue that the ALJ failed to discuss the factors of supportability or consistency. *See* 20 C.F.R. 416.920c(a). Rather, he argues that the evidence supports a finding that Dr. Hunt's opinion was consistent with the record, to show that there was evidence that he believes would make Dr. Hunt's opinion more persuasive than the ALJ concluded it to be. Because Norris is arguing that the evidence supports a different outcome, this argument amounts to a claim that the ALJ's determination was not supported by substantial evidence.

in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Norris, however, has not provided anything to contradict the ALJ's statement.

Norris also appears to argue that the court ignored evidence because the ALJ did not explicitly discuss certain aspects of Norris's history of abuse. Doc. 9, at 7–8.[14] But just because an ALJ does not cite something does not mean it was not considered. The fact that the ALJ did not re-cite portions of the record by exhibit or page number in her discussion of Dr. Hunt's opinion, does not mean that the ALJ did not evaluate the entire record or that her opinion is not supported by substantial evidence. *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for the ALJ's decision to stand."). The ALJ described what evidence in the record led her to reasonably conclude that Dr. Hunt's opinion was unpersuasive. *See* Tr. 39; *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th

---

[14]     Norris cites *Lester v. Saul*, 2020 WL 8093313, at *10 (N.D. Ohio Dec. 11, 2020) throughout his brief to support the argument that the ALJ's decision discussed irrelevant evidence. *E.g.*, Doc. 9, at 5-6. *Lester* neither supports a finding that the ALJ considered irrelevant evidence, nor does it establish that "relevance" of evidence in the record is an appropriate inquiry on review. As cited, *Lester* instead supports the general proposition that an ALJ must "'articulate how he/she considered the medical opinions' and 'how persuasive he/she finds all of the medical opinions.'" *Lester*, 2020 WL 8093313, at *10. The issue in *Lester* was whether the ALJ had provided "adequate rationale as to why all opinions of record were rejected" as required by applicable regulations. *Id.* Norris does not argue that the ALJ failed to articulate why she found Dr. Hunt's opinion was unpersuasive. Rather, he argues that the evidence on which the ALJ relied was "irrelevant." *Lester* lends little support for that argument.

Cir. 2001) ("Judicial review of the [Commissioner's] findings must be based on the record as a whole.")

Norris identifies several facts that he believes demonstrate an error by the ALJ. He disputes the ALJ's assessment that he gets along with his roommates. Doc. 9, at 7. The ALJ, however, recognized that Norris lives with supportive roommates and otherwise communicates with friends. Tr. 33, 34; *see also* Tr. 88 (finding that Norris "lives with friends"); Tr. 602 (Dr. Hunt finding that Norris's "friends" among other people are aware of his transition); Tr. 681 (Dr. Hunt noting that Norris moved to Indiana to live with a friend named "Kenthia" while he underwent surgery). Norris also states that the ALJ did not acknowledge that one of his roommates is his significant other. Doc. 9, at 7. The ALJ, however, noted that Norris moved to Cleveland "in 2018 to live with a partner." Tr. 36. But Norris does not explain why this information matters. Norris also points out, without explanation as to why it might constitute error, that the ALJ did not discuss Dr. Hunt's assessment of Norris's history of abuse and connection to manipulative people. Doc. 9 at, 7. And, the alleged cooperation issue lacks merit. Doc. 9, at 8. Norris presented as cooperative throughout his treatment notes. *E.g.*, Tr. 540. As the ALJ noted, this record evidence conflicts with Dr. Hunt's check-box opinion which indicates marked or extreme limitations in the ability to interact with others. Tr. 664.

Though Norris disputes the "relevance" of the facts described, he does not dispute that they exist within the record. Simply because Norris can identify facts other than those cited by the ALJ which may support a different outcome, does not negate that the ALJ has also rendered a decision based on substantial evidence. *Jones*, 336 F.3d at 477.

As with his first point, Norris's second sub-argument amounts to an argument that the ALJ's decision was not supported by substantial evidence. Because the ALJ's decision is supported by substantial evidence, I recommend that this argument be rejected.

*Third*, Norris appears to argue that the performance of chores and part-time work does not contradict Dr. Hunt's opinion.

Norris says that "[t]he next two … reasons, working part-time and performing chores, also fail to show how the opinion is inconsistent." Doc. 9, at 9. So he appears to argue that performing chores and working do not support the ALJ's decision to discount Dr. Hunt's opinion, apparently because these activities aren't relevant to Dr. Hunt's opinion. Doc. 9, at 9–10. In so doing, Norris is again essentially arguing that the ALJ failed to support her decision with substantial evidence. This argument remains unpersuasive. The ALJ's decision, when read as a whole, provided sufficient explanation to support her conclusion that "Dr. Hunt's opinion is out of proportion with the evidence regarding the claimant's functioning during this period[.]" Tr. 39; *Heston*, 245 F.3d at 535. Specifically, the ALJ described that Dr. Hunt's notes indicated

27

Norris had the ability to move to several states, interact with her roommates and friends online, and work part time. Tr. 39. The fact that Norris believes certain evidence was "irrelevant" does not justify remand because it is the job of the ALJ to weigh the evidence, not the Court. *See Gill*, 2023 WL 4078193 at *16. Because the ALJ's decision is supported by substantial evidence, I recommend that this argument also be rejected.

*Fourth*, Norris argues that the evidence the ALJ called "normal" findings were not relevant aspects of his behavior to consider because they were irrelevant to Dr. Hunt's opinion. Doc. 9, at 10.

Norris, who generally argues that his mental limitations should result in a finding of disability, argues here that Dr. Hunt's notes showing he had normal "memory, cognition, being alert, and pleasant" are irrelevant. Doc. 9, at 10. In this argument, however, Norris does not allege the ALJ failed to consider the substance of Dr. Hunt's notes. Instead, Norris simply takes issue with the weight the ALJ afforded certain evidence.

The ALJ identified certain inconsistencies between what she viewed as "normal" findings indicated throughout treatment notes and the check-box opinion provided by Dr. Hunt. Tr. 38–39. The ALJ ultimately found that Dr. Hunt's opinion was "out of proportion" with her other treatment notes. Tr. 39. In so doing, the ALJ identified certain facts contained within those progress notes which are easily identifiable in the record evidence. Tr. 39.

28

Specifically, the ALJ described that Norris moved to multiple new states in recent years, got along with his roommates and friends online, kept up with household chores, and was able to work part-time. Tr. 39. Norris does not dispute the existence of these facts in the record; rather he simply argues that they are not relevant. The ALJ also found that Dr. Hunt's opinion was "inconsistent" with treatment notes from Norris's other providers throughout the record. Tr. 39. For example, the ALJ stated that Norris was "reporting a good response to medication with his prescribing providers." Tr. 39. This statement is supported by earlier record cites. *E.g.*, Tr. 37 (citing Exhibit 9F, p. 44); Tr. 38 (citing Exhibit 12F, p. 19). The Court reviews the ALJ's decision based on a reading of the decision as a whole. *Heston*, 245 F.3d at 535 ("Judicial review of the [Commissioner's] findings must be based on the record as a whole."); *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115235, at *6 (N.D. Ohio Sept. 9, 2022) (finding that the ALJ's decision when "read as a whole" demonstrated the necessary factors of supportability and consistency were considered). Read as a whole, the ALJ's decision provided a reasonable articulation of the evidence and the ALJ appropriately explained her reasoning. Simply because Norris disagrees with the ALJ's weighing of the entirety of the evidence, does not justify remand.

Norris makes a passing statement that the decision in *Clark v. Comm'r of Soc. Sec.*, No. 2:20-cv-3338, 2021 WL 1903912, at *6 (S.D. Ohio May 12, 2021), *report and recommendation adopted*, 2021 WL 4067407 (S.D. Ohio May

12, 2021), addressed the argument he raises. Doc. 9, at 10. The quotation cited, however, relates to an argument that Norris does not appear to make, i.e., that the ALJ failed to articulate the factors of supportability and consistency. *See* Doc. 9, at 10 (quoting *Clark*, 2021 WL 1903912 at \*6). Instead, Norris uses this citation to support his argument that the ALJ failed to create a "logical bridge" because evidence of what the ALJ considered "normal" functioning "has no true explanation or relevance to Dr. Hunt's opinion." Doc. 9, at 10. This argument, again, lacks merit.

Because the ALJ's decision contains sufficient explanation of the record evidence and is supported by substantial evidence, I recommend that this argument be rejected.

2.    *Norris's second issue* is that the ALJ erred at Step 5 by finding that significant numbers of occupations existed based on Norris's RFC determination. Doc. 9, at 11–12.

At Step 5, the ALJ considers the claimant's RFC in combination the claimants "age, education, and work experience to see if [the claimant] can make an adjustment to other work." 20 C.F.R. § 416.920(a)(4)(v), (g)(1). "Any other work (jobs) that [a claimant] can adjust to must exist in significant numbers in the national economy (either in the region where[a claimant] lives or in several regions in the country)." 20 C.F.R. 416.960(c)(1); 404.1560(c)(1). To support a finding that a claimant is not disabled at Step 5, the Commissioner is "responsible for providing evidence that demonstrates that

30

other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's] residual functional capacity and vocational factors." 20 C.F.R. 416.960(c)(2); 404.1560(c)(2).

Norris argues the ALJ erred because a "finding of 'significant numbers' is not supported by substantial evidence." Doc. 9, at 11. In support of his argument that "18,600"[15] jobs do not amount to "significant numbers," Norris cites various cases from courts within and without the Sixth Circuit. Doc. 9, at 11–12. These cases lend little support to Norris because they show that courts have found significant numbers did not exist when there were anywhere from 16,900 jobs to 60,000 jobs. Doc. 9, at 11–12. As the Commissioner highlights, however, the Sixth Circuit has found significant jobs exist where there were much fewer than 18,800 jobs available. Doc. 11, at 16; *see e.g.*, *Taskila v. Comm'r*, 819 F.3d 902, 905 (6th Cir. 2016) ("Six thousand jobs in the United States fits comfortably within what this court and others have deemed 'significant.'"). In his reply, Norris argues that his citations to cases outside of the Northern District of Ohio "provide relevancy" and points to decisions in other districts that found, as Norris characterized, that *Taskila* was based on "incorrect calculations/reviews." Doc. 12, at 5–6. He boldly says that *Taskila* "should not be followed." *Id*. at 6.

---

[15] It appears Norris has either miscalculated or mistyped the number of jobs the ALJ found available. The total jobs available nationally, as based on a non-exhaustive list of occupations, was 18,800. Tr. 41.

31

The Sixth Circuit has not overruled *Taskila*. *See Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (relying on *Taskila* for the point that 6,000 jobs could be deemed significant), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023). It should go without saying that this Court is not going to ignore binding Sixth Circuit precedent simply because Norris thinks that it was wrongly decided.

Norris's argument also fails to show that the ALJ's decision, that 18,800 jobs exist nationally, and that 18,800 jobs constituted a significant number of jobs, was unreasonable. Rather, his argument again amounts to a dispute over the substantial evidence. The ALJ, however, explicitly stated that her finding was based on the testimony of the vocational expert. A vocational expert's testimony in response to a hypothetical can provide substantial evidence, so long as the hypothetical accurately represents the claimant's condition. *Pasco v. Comm'r of Soc. Sec.*, 135 F. App'x 828, 845 (N.D. Ohio Jun. 23, 2005) (citing *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). Norris has made no argument that the vocational expert's testimony was based on an inaccurate hypothetical or otherwise does not constitute substantial evidence. Indeed, the ALJ specifically stated that "[b]ased on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." Tr. 41. Because the

32

ALJ based her determination that a significant number of jobs exist on the unchallenged testimony of the vocational expert, the ALJ's decision was supported by substantial evidence. Accordingly, I recommend that this argument be rejected.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: April 1, 2024

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).